## Poor District Case (No. 1).

392

Argued January 4, 1938.   Before KEPHART, C. J.,
SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*J. C. Loose* and *A. S. Loose,* filed a brief for plaintiff,
No. 90.

*Robert T. McCracken,* with him *Edward G. Taulane, Jr., R. Lawrence Coughlin, W. D. Lewis* and *H. F. Bonno,* for defendants, Nos. 90, 102 and 103.

*John D. Farnham,* for plaintiffs, No. 102.

*Robert M. Fortney,* filed a brief for plaintiff, No. 103.

*Robert T. McCracken,* with him *Edward G. Taulane, Jr.,* and *S. Aug. Davis,* for plaintiff, No. 104.

*Philip V. Mattes,* County Solicitor, for defendants, No. 104, and for plaintiff, No. 109.

*Robert T. McCracken,* with him *Leo W. White,* for plaintiff, No. 123.

*Philip V. Mattes,* City Solicitor, for defendants, No. 123.

*Harry E. McWhinney,* for plaintiff, No. 93.

*Robert T. McCracken* and *Thomas F. Garrahan,* with them *H. W. McIntosh,* for defendants, No. 93.

*William McElwee, Jr.,* with him *George T. Weingartner,* for plaintiff, No. 106.

*Charles J. Margiotti,* Attorney General, with him *Edward Friedman,* Deputy Attorney General, and *Francis J. Myers,* Assistant Deputy Attorney General, for Commonwealth, intervenor, Nos. 90, 102, 103, 104 and 109.

*Jacob S. Richman,* with him *Earl G. Harrison* and *Shippen Lewis,* for Public Charities Association of Pennsylvania, amicus curiæ.

OPINION BY MR. JUSTICE DREW, January 31, 1938:

In 1936, the Pennsylvania Committee on Public Assistance and Relief was organized by the Governor to study and make recommendations for a new and more effective system of administering poor relief in the Commonwealth. The first general report of the committee, popularly known as the "Goodrich Report," was published on December 15, 1936, under the title "A Modern Public Assistance Program for Pennsylvania." This report recommended: "That Pennsylvania's program of public assistance of needy persons at home, including general poor relief, unemployment relief, aid to dependent children in their own homes (known as mothers' assistance), and in foster homes, old age assistance, and aid to the blind, be unified and simplified and be administered through a single public organization in each county, subject to supervision by a single permanent department of the State government."

"That the county, district, township, and borough Poor Boards be abolished immediately and their powers, duties, rights, and privileges with respect to outdoor relief and the care of dependent children be transferred to the County Board of Assistance, and their powers, duties, rights, and privileges with respect to almshouse and other institutional care be transferred to the County Commissioners. . . ."

As a direct result of these recommendations the following Acts were passed: Act No. 399 of June 24, 1937, P. L. 2051, which eliminates the poor board's historic function of providing public aid for persons in their own home and places responsibility for administration of such relief upon sixty-seven county boards, one in each county; Act No. 395 of June 24, 1937, P. L. 2003, which creates the Department of Public Assistance and the State Board of Public Assistance and defines the powers and duties of each; Act No. 396 of June 24, 1937, P. L. 2017, which provides for institutional care for certain indigent persons with physical or mental infirmities on

a state-wide basis, and also for support and placement of dependent children needing foster care. To administer these duties, as well as any other poor board functions, an institutional district is created in each county, and also in first and second class cities, and administrative and financial responsibility is placed on existing city and county officials.

These acts abolish more than four hundred twenty-five poor boards, sixty-seven County Mothers' Assistance Boards and the State Emergency Relief Board with its subsidiary boards in all parts of the state.* In

---

* "Pennsylvania in its early history passed a series of laws acknowledging the responsibility of the community through government for the care of the poor by both outdoor and almshouse relief. William Penn's first assembly (1682) provided for the care of the poor by the courts, and in 1705, a general poor law was enacted, based almost entirely on the old English law of Queen Elizabeth's time (1601). The relief of the poor was hereby placed under the control of overseers of the poor, with full jurisdiction over all types of applicants for relief—able-bodied adults, children, insane, criminal, crippled, blind, or chronically ill. There have been three general revisions of the Poor Laws (1771, 1836, 1925), and many special laws have been enacted.

"There are 425 poor districts (ranging in size from small townships to large counties) with 967 Directors of the Poor and 85 almshouses. Poor Boards vary widely in the number of members, tenure of office and in remuneration of members. Districts are administered by County Commissioners in 22 counties, by elected Directors of the Poor in 27 and by appointed Directors in One. Fifteen counties have municipal or intermunicipal districts, and two others (Philadelphia and Allegheny Counties) have other forms of organization.

"Poor relief is local and decentralized in organization. Some supervision by the State Department of Welfare is authorized by law. The Division of Community Work of the Department makes inspection of almshouses, and examines and recommends record systems. The Poor Directors in each poor district are practically autonomous. . . .

"In recent years, the State has taken over responsibility for increasing numbers of persons who formerly would have been a charge upon the Directors of the Poor. It has created special

place of this patchwork of nearly 500 agencies whose related functions and responsibilities inevitably resulted in overlapping of jurisdiction, duplication of effort, conflict of parties and multiplication of costs, this legislation substitutes a uniform and progressive plan. In consolidating all relief and assistance agencies, it eliminates 400 taxing units of government and reduces the assistance organizations in each county to no more than two, and separates home assistance (Act No. 399) from institutional assistance (Act No. 396) and subjects the former to supervision by the State Department of Assistance and the latter to that of the State Department of Welfare. These acts remove the last reason for the continued existence of the poor board system, and mark

funds for mothers' assistance, the blind, the aged, dependent veterans, and the unemployed.

"Almshouse care was provided for in the early history of Pennsylvania by the same laws which set up outdoor relief. More recent acts have slightly modified and defined almshouse care. In 1883 a law was enacted which prohibited the keeping in almshouses for more than sixty days, of normal children between the ages of two and sixteen, and requiring Directors of the Poor to place such children, either in foster family homes or in educational institutions rather than to permit them to associate permanently with adult paupers. Further legislation during this decade paved the way for the removal of indigent insane persons from almshouses to state mental hospitals. Almshouse care was further authorized by the General Poor Relief Act of 1925 which codified many prior acts and applied to poor districts in all counties of the State except Philadelphia and Allegheny, which are specifically exempted from provisions of the 1925 Act and are regulated by prior general and local acts.

"Pennsylvania's poor districts maintain 85 almshouses, ranging in size from a farmhouse with no inmates to an institution housing nineteen hundred persons. Forty have less than a hundred inmates each. Forty-seven of the 67 counties have county-owned and operated almshouses. In the remaining sections of the State, almshouses are operated by the township, borough, municipal or mixed district. Three small counties and over three hundred townships or boroughs provide no almshouse care": Goodrich Report, December 15, 1936, pp. 99, 100."

the culmination of an evolution that has been taking place for nearly a century and a half.

Townships were the units of poor administration provided by the earliest legislation on the subject (Act of January 12, 1705, Statutes at Large, vol. 2, chapter 54) and were continued so by subsequent acts: Act of March 9, 1771, 1 Sm. L. 332; Act of March 25, 1782, chapter 951. By 1798 the transition from township to county units had begun. The Act of February 27, 1798, ch. 1960, provided for the erection of almshouses in Chester and Lancaster Counties and substituted county directors of the poor for the township overseers. By 1808 similar changes had been made in seven other counties. By a series of further special acts, twenty additional counties were established on a county unit plan. Pursuant to the general Act of June 4, 1879, P. L. 78, fifteen more counties were so established. To these were added by the Act of May 14, 1925, P. L. 762, six additional counties, and two more by the Acts of April 11, 1929, P. L. 508, and of May 28, 1931, P. L. 208. Of all the 67 counties, only fifteen did not conform to the county unit plan when Act No. 396 made it applicable to all.

In these fifteen counties there are numerous poor districts specially created, and not according to any systematic pattern. They are single townships, combinations of townships, of boroughs and townships, of townships and cities, and in a few cases comprise territory which crosses county lines. In some instances they have totally ceased to function, and in some their offices have no incumbents. In Philadelphia some districts remain from the time when townships were the uniformly prevailing units of poor administration outside the then limits of the city, covering areas which have long ago been absorbed by the city, and long since lost their township identity except to give boundaries to these poor districts. As early as the Act of 1705, supra, Philadelphia was constituted a distinct and entire district. The policy in favor of having it so has not changed; re-

vision of archaic poor laws has merely not kept pace with the expansion of the physical limits of the city.

Act No. 396 is not the result of a sudden recognition of the existing conditions. They were recognized in the passage of the Act of 1879, supra. It applied uniformly to every county in the Commonwealth, but being optional its effect was not as general as its plan. The situation was studied by a legislative commission appointed in 1921 and continued in 1923. It recommended abolition of the smaller districts. The recommendation was adopted only in part by the Act of 1925, supra. It made so many exceptions that we thereafter had occasion to remark that "the classification of poor districts is and always has been very badly mixed up": *Commonwealth ex rel. v. Liveright,* 308 Pa. 35, 83.

Act No. 396, so far as institutional care of the indigent is concerned, completes the task of establishing an orderly plan on a county basis, begun by the earlier acts. With the exception of first- and second-class cities (Article II) each county is created an institution district (section 301) to be administered by the county commissioners (section 302). Where this arrangement has not already prevailed, existent poor districts are abolished (sections 301, 601). The officials of the old poor districts, whether county poor districts or independent districts, are retained for their terms as employees of the new district (sections 302, 601). As similarly provided in the Acts of 1879 and 1925, independent districts continue for the purpose of winding up (section 601). Liquidation is placed in the hands of the commissioners of the counties in which the districts are (section 602) or the commissioners of both counties where the district lies in more than one (section 603). Where the new and old districts are coterminous the property of the latter is transferred to the former (section 301). Where they are not, it is transferred to the municipal subdivision or subdivisions in which the old district existed with the option in the new county dis-

trict to rent or purchase on certain conditions (sections 602, 603). And where a former district lies within a first-class city its property is transferred to the city (section 201). Various powers, duties and regulations for the administration of county institution districts (Article III) and for the administration of all institution districts, whether county or first or second class cities (Article IV), are established. The foregoing is the general framework of the act. We shall deal with certain parts of it more particularly where necessary in connection with the discussion of the constitutional questions raised.

A statute is constitutional until it is shown to be otherwise. A presumption always favors it because the General Assembly has jurisdiction of all subjects on which its legislation is not prohibited, for which reason the provisions of the Constitution should be liberally construed and in favor of constitutionality. With this in mind we shall answer seriatim the numerous objections made.

1. Does Act No. 396 of June 24, 1937, P. L. 2017, violate Article III, section 3, of the Constitution of Pennsylvania, which provides, "No bill, except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in its title"?

It is contended that this provision is violated because the act does not provide merely for the poor but covers this subject as well as a number of others, namely, the care of children, deaf and dumb or blind persons, mental and other patients without regard to indigence or dependency. This argument is based on a forced construction of language perfectly plain in its context. There is no violation of this clause when various subjects are connected with and germane to the one general object of the legislation. Plurality of subjects is not objectionable so long as they are reasonably germane to each other: *Mallinger v. Pittsburgh*, 316 Pa. 257, 261. Only when its subjects are dissimilar is a law to be stricken

down: *Booth & Flinn, Ltd., v. Miller,* 237 Pa. 297, 303. An examination of the body of the act indicates that it has but one subject and one purpose only. It provides for indigents needing institutional care.

The title of the act refers to "indigent persons and children." There can be no doubt that this means indigent persons and indigent children as the act throughout demonstrates. Defining the duties of the new institution district authorities with respect to children, section 405 provides that "it shall be their duty to place in foster homes or in institutions or homes for children all dependent children who are in, or committed to, their charge, and whose placement and care are not otherwise provided for. . . ." Other sections [401(d), 406] which have to do with paying the bills incurred in the discharge of that duty, while referring to children without the adjective "dependent," must be read in connection with section 405. Undoubtedly the provisions relating to children mean dependent children only. The same objection is raised with regard to deaf and dumb or blind persons. Section 401(c) invests local authorities with the duty "to care for any dependent having a settlement in the county or city who is deaf and dumb or blind. . . ." Power is given to discharge the duty by contracting "with any association in Pennsylvania organized to provide a home or employment for deaf and dumb or blind persons. . . ." It is evident that this clause refers to cases in which local authorities are relieved of the duty of caring for such persons in a county institution, and consequently must refer to dependents. There would be no thought of providing for them if not dependents. There is not the slightest doubt of this when the section is considered as a whole. The plain language of the act is indicative of its general purpose, namely, the care of dependents. This applies to and disposes of the objection that section 401(e), requiring local authorities to pay for the "maintenance of mental and other patients confined in institutions, State men-

tal hospitals, and other State institutions . . .," includes patients not necessarily poor.

Also attacked under this objection are sections 601, 602, and 603, which abolish existing poor districts except for the purpose of liquidating their affairs. The liquidation of existing districts is thought to be unrelated to the provisions setting up a system of new institution districts. Plainly it is not. It provides merely for an orderly transition from the old to the new, is perfectly germane to the general purpose of the act, and similar provisions were so recognized in the Acts of 1879 and 1925. The single object of this act, toward which all its provisions tend, is to provide a uniform and comprehensive system for institutional care of the poor.

The title is ample to indicate the subject matter of the act and is not misleading. A title need not be an index or synopsis of an act yet it must not mislead: *Dailey v. Potter County*, 203 Pa. 593. It is enough if it give such notice of the contents of the act as to put the reader to further inquiry: *Turco Paint & Varnish Co. v. Kalodner*, 320 Pa. 421, 436.

It is contended that this title is defective because it does not give notice of the imposition of duties upon county auditors and controllers, and that municipalities coterminous with old poor districts will be vested with their property. Expressly mentioned as officers of the institution districts are county commissioners and treasurers; this was enough to cause auditors and controllers of counties to realize that in the performance of their usual duties they would be required to include the new institution districts. The title expressly says that the property of abolished poor districts would be transferred. This was notice to municipal subdivisions, townships, boroughs, or cities, that they might be the transferees under the terms of the act. We said in *Commonwealth v. Macelwee*, 294 Pa. 569, 571, " 'An act concerning townships' is notice to all persons located

therein and to every subordinate municipal division of the State located wholly or partially within them, that there may be, in the body of the act, something which affects his or its interests. . . ." Similarly here, the change to a county unit system was so complete, and the fact so obviously appeared in the title that anyone interested in the government of counties or lesser municipal units was bound to take notice of the contents of the act. It must be remembered that the constitutional provision as to titles was intended to curb "the vicious practice ; . . of incorporating in one bill a variety of distinct and independent subjects of legislation [the real purpose of which] was often and sometimes intentionally disguised by a misleading title or covered by the all-comprehensive phrase, 'and for other purposes' with which the title of many 'omnibus' bills concluded": *Road in Phœnixville,* 109 Pa. 44, 48; *Sugar Notch Borough,* 192 Pa. 349, 355. It cannot be contended that any such thing was attempted or resulted here.

2. Does the act violate Article III, section 7 of the Constitution of Pennsylvania, which provides: "The General Assembly shall not pass any local or special law . . . regulating the affairs of counties, cities, townships, wards, boroughs or school districts . . . [or] relating to . . . public grounds not of the State. . . ."?

Even a casual examination will disclose that this legislation is general in purpose and effect, covers every county in the state, and cannot be considered special or local legislation. It would be difficult to imagine how it could be made more comprehensive as to territory, or more uniform and general in its effect. It is true that by its provisions it abolishes independent poor districts, winds up their affairs, and transfers their property, and that this only applies where independent districts exist. This results because many anomalous poor districts without counterpart anywhere were specially created in

the past. Of such the Central Poor District of Luzerne County and the Middle Coal Field District of Carbon and Luzerne Counties, involved in the cases before us, are perfect examples. There are many others. But their very oddity does not make the present act special in its application to them. Passing upon a substantially similar problem in *Opening of Ruan Street,* 132 Pa. 257, 281, 282, this court said, "These sections [of the act in question] do not simply tend to uniformity, but they accomplish it. . . . The remedy is as broad as the evil to be corrected. A law which repeals a local law must of necessity affect only the locality in which the local law prevailed; but it is not, therefore, a local law within the meaning of the constitution. *It does not set up, but it destroys, a local system, and thereby extends the general law over the territory previously withdrawn from its operation."* [Italics added.]

The present act is special neither in its effect on the old districts, on the municipal subdivisions within them, nor as relating to public grounds. All old poor districts not coterminous with counties, no matter how created, every tract of public ground used by them for poor purposes, every municipality within their limits, are affected equally. The aim and object of the whole act is to do away with hundreds of special situations and to standardize the administration of institutional relief throughout the Commonwealth. The case would be very different if specially created districts were singled out and continued with regulations different from those applicable to districts generally, a device condemned in *Upper Merion Township v. Bridgeport Borough,* 299 Pa. 297, 302, relied upon by the opponents of the act. The constitutional prohibition applies no matter how artful the attempted evasion of its terms, but it cannot be so interpreted that it prevents compliance and nullifies the very policy that supports it. "Where the legislative intent is not to evade the restrictions the courts are not required to be astute in extending them over cases not

really within the evil prohibited though the form may have the appearance of coming within the literal words of the constitution": *Commonwealth v. Gilligan,* 195 Pa. 504, 513, 514.

Not being special legislation in any respect, Article III, section 8, requiring publication of notice before the passage of special legislation in permitted fields of which poor districts are one, is entirely inapplicable.

3. Does the act violate Article III, section 20, of the Constitution, providing, "The General Assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever"?

The objects of this section are to prevent "the separation of the power to incur debts from the duty of providing for their payment by taxation" *(Tranter v. Allegheny County Authority,* 316 Pa. 65, 78), and "to protect against the exercise of the taxing power by officials not subject to the control of the people": *Wilson v. School District of Philadelphia,* 328 Pa. 225. Neither of these policies is violated by this act in any particular.

It is claimed county commissioners are constituted a special commission in that their functions when spending for the institution districts, under section 401, are separated from their functions when levying requisite taxes under section 307 as commissioners of the county. This is a mere juggling of terms to get a desired result. The basis for this alleged cleavage between power to spend and duty to tax is claimed to rest in the fact that in section 401, and indeed throughout Article IV, they are referred to as "local authorities" whereas in section 307 the reference to them is as "commissioners." Whether referred to as "local authorities" or as "commissioners" they are one and the same thing, "county commissioners." This is made perfectly clear by sec-

tion 102 which says that "Local Authorities means the county commissioners acting as officers of an institution district. . . ." The term "local authorities" is used in article IV so that it may apply where necessary both to counties where commissioners are in charge and to first and second class cities where control is in the department of welfare.

It is also contended that when county commissioners are empowered to levy taxes within former independent poor districts for the purpose of paying off their outstanding obligations under sections 602(b) and 603(b) they are a special commission. We think otherwise. There is no separation of the duty to tax from the power to incur obligations mentioned in *Tranter v. Allegheny County,* supra. The obligations to be paid are already existent. Nor is the taxing power conferred upon a nonelective body within the condemnation of *Wilson v. School District,* supra. The voters of the former poor districts are represented in the election of the commissioners. That their voice may not control the election makes no difference. Hence in *Pennsylvania Co. v. Pittsburg,* 226 Pa. 322, 330, the act authorizing the council of the consolidated City of Pittsburgh after the annexation of the City of Allegheny to levy a separate tax within the area of each constitutent city sufficient to pay the outstanding indebtedness of each, was held constitutional. The constitutional provision is a "limitation on the power of the legislature to delegate to a nonelective board or commission the power to. tax" *(Wilson v. School District,* supra). It can have no application to county commissioners who are elected officials with the power to tax. For these same reasons it is no objection in the case of the Allegheny County District that citizens of Pittsburgh, which is a separate district, will vote along with the rest of the county in the election of the county commissioners, under whose direction the institution district will be administered.

It is also contended that the State Department of Welfare is created a special commission in violation of this constitutional mandate because of the provisions that an institution district may not purchase or acquire land, erect or alter buildings without its approval (section 305) and that it shall establish "rules, regulations, and standards" (sections 401, 409). Extensive provisions of similar nature were contained in the Act of 1925, supra, the constitutionality of which has been upheld without so much as mention of these features: *Commonwealth v. Reese,* 293 Pa. 398. An analogous aspect of the Act of April 7, 1927, P. L. 161, requiring the approval of the State Board of Education for the annexation of a township to a contiguous city was likewise sustained against challenge under this constitutional provision: *Baldwin Township Annexation,* 305 Pa. 490, 496. There is no unusual power conferred upon the State Department of Welfare and no control vested in it over the institution district. In fact the Department is given no power to perform a municipal function. The sole purpose of the sections here attacked is to constitute the State Department of Welfare a coördinating and standardizing nucleous for the whole institution district system. It can advise action by commissioners, check action where ill-advised, prescribe forms in which certain routine matters are to be done, but it cannot itself act in their place. Such supervision does not supplant the function of local authority but is in aid of it and so constitutional: *Walnut and Quince Street Corp. v. Mills,* 303 Pa. 25, 33; *Commonwealth ex rel. v. Woodring,* 289 Pa. 437, 445.

4. Does the act violate the provisions of Article III, section 18 of the Constitution which prohibits appropriations "for charitable, educational, or benevolent purposes, to any person or community [or] to any denominational or sectarian institution . . ." or Article IX, section 7, which provides "The General Assembly shall not authorize any county, city, borough, township

or incorporated district . . . to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual"?

It is urged that the act violates the constitution because it provides for appropriations for those who are not dependents and to outside agencies. Inasmuch as no such appropriations have been made and no controversy can arise as to their validity until they are made, we might well refuse to decide the question now: *Commonwealth v. Haldeman,* 288 Pa. 81, 83; *Commonwealth v. Alderman,* 275 Pa. 483, 487. The conclusive answer, however, is that the act has but one subject and embraces only the indigent. It is admitted that there is no prohibition against the use of public moneys for the care and maintenance of such persons: *Commonwealth ex rel. v. Liveright,* supra; *Busser v. Snyder,* 282 Pa. 440, 453. Furthermore, poor relief being admittedly a proper governmental function, Article IX, section 7, does not forbid appropriations to other agencies that aid in carrying it out: *Sambor v. Hadley,* 291 Pa. 395, 401, 402; *Commonwealth ex rel. v. Barker,* 211 Pa. 610, 614.

5. Does the act violate the provision of Article IX, section 1 of the Constitution which is as follows: "All taxes shall be uniform . . . within the territorial limits of the authority levying the tax. . . ."?

The claim is made that this provision is violated in that the county commissioners are authorized to levy special taxes in the area comprising any former independent poor district in order to pay off such poor district's outstanding obligations. Sections 602(b) and 603(b), which give them this authority, do not offend this provision. The independent poor districts had power to levy taxes within their territorial limits. The instant act does not completely abolish the districts, but continues them to the extent necessary to liquidate their affairs, and the county commissioners are designated directors for the purpose of liquidation. These districts

were given power to tax because they were carrying out a governmental purpose, namely, the care of the poor. Certainly payment of the obligations incurred is not to be prohibited, merely because the duty to levy the requisite tax is transferred to other public officials. In some cases, it is true, a single county contains a number of old poor districts, the outstanding obligations of which will vary in amount and require different rates of tax. Nevertheless, the old district, not the county, will comprise "the territorial limits of the authority levying the tax." It is urged that when the duty to care for the poor had been taken away the old districts could not be preserved as tax units. The duty to care for the poor has, indeed, been taken away from the old districts, but not the duty to pay debts incurred for their care in the past. The same method of paying the debts of the constitutent cities in a consolidation has been approved: *Pennsylvania Co. v. Pittsburg,* supra.

6. Does the act violate Article VI, section 4 of the Constitution, which provides that appointed officers may be removed only by "the power by which they shall have been appointed" and officers elected by the people only "by the Governor for reasonable cause, after due notice and full hearing, on the address of two-thirds of the Senate"?

Section 601 of the act removed from office the poor directors of the independent districts. In some districts they had been appointed by the courts and in others elected by the people. The decisions are unanimous in holding that this section of the Constitution provides an exclusive method for the removal of public officers, but they are likewise unanimous in holding that the abolition of the office itself, or the removal of the incumbent as an incident to a bona fide reorganization of a governmental agency, does not violate the section: *Suermann v. Hadley,* 327 Pa. 190; *Commonwealth ex rel. v. Clark,* 327 Pa. 181; *Lloyd v. Smith,* 176 Pa. 213; *Commonwealth v. Weir,* 165 Pa. 284. Section 601 only removes

the incumbent poor directors as an incident to the abolition of their offices and of the poor districts which they administered, except for liquidating purposes.

7. Does the act impair the obligation of contracts in violation of the Constitution of the United States and that of Pennsylvania? Argument under this head proceeds entirely upon the assumption that sections 601; 602 and 603 empowering county commissioners to levy taxes in the former poor districts for the payment of their outstanding debts are unconstitutional either as constituting the county commissioners a special commission or as authorizing them to levy taxes that are not uniform. Consequently, it is claimed that the act abolishes the poor districts without making provision for the payment of their debts. In view of what we have already decided the assumption fails, and with it the argument. There is no impairment of the obligations of the extinguished poor districts.

8. Does the act violate and nullify section 4 of Article XV of the Constitution of Pennsylvania relating to Allegheny County, which provides: "The General Assembly is hereby authorized to provide for the consolidation of the county, poor districts, cities, boroughs and townships of the County of Allegheny, and the offices thereof, into a consolidated city and county, with the constitutional and legal capacity of a municipal corporation, to be known either as 'Greater Pittsburgh' or 'Metropolitan Pittsburgh' or 'City of Pittsburgh (Metropolitan)' and to provide for a charter for its government, and to fix the name thereof in the charter. The said charter shall be submitted to the electors of said county at a special or general election to be provided for therein. . . ."? (Amendment of November 7, 1933).

It is true that the act abolishes poor districts and that 'poor districts' are within this amendment to the Constitution. The power of the General Assembly, with the consent of the people, to consolidate all governmental units within Allegheny County is not impaired by

its own action in passing the instant act creating the county an institution district. When the power to consolidate is exercised, the county institution district, as well as the separate city district, will be affected the same as the superseded poor district would have been. The amendment of 1933 did not crystallize in their then existent form all governmental units in Allegheny County, to be changed only as therein provided. The amendment added to the power of the Assembly; it did not take away with respect to Allegheny County all the lesser powers it always had.

The act is valid and constitutional and therefore we enter the following orders. In Nos. 93, March Term, 1938, 90, 102 and 103, January Term, 1938, the bills are sustained and the directors of the Allegheny County Home, the directors of the Middle Coal Field Poor District, the directors of the Central Poor District of Luzerne County, and the directors of the Poor District of Coal Township are enjoined from acting in violation of Act No. 396 of June 24, 1937, P. L. 2017; in Nos. 109 and 123, January Term, 1938, the bills are dismissed; and in Nos. 104, January Term, 1938, and 106 March Term, 1938, the petitions are denied.

