Housing Rehabilitation by Municipalities

KANE, Attorney General, July 25, 1975.—You have asked us to determine whether:

1. Pennsylvania municipalities may legally undertake programs of rehabilitation of low and middle income housing; and

2. If they may, could they authorize, as their agents, either (a) the local redevelopment authority; (b) the local housing authority; or (c) a local nonprofit corporation, to implement such a program?

For the reasons more specifically set forth below, it is our opinion, and you are hereby so advised, that Pennsylvania municipalities do have the power and authority to undertake progams of rehabilitation of low and middle income housing, and may appoint public bodies, such as redevelopment authorities and housing authorities, subject to the conditions explained below, to act as their agents in performing this governmental function. Local nonprofit corporations may be used only to the extent of providing such administrative services so as not to contravene the constitutional prohibitions on the delegation of public powers.

## FACTUAL BACKGROUND

At the beginning, we take note that both the Governor and the President have proclaimed the provision of adequate, safe, sanitary and decent housing for each of our citizens to be of the utmost priority. This priority may be accomplished in two ways. The first would be the encouragement of more housing through new construction. Second would be the rehabilitation of those houses in our current stock which are presently substandard.

We are also aware that many Pennsylvania municipalities will be receiving Federal funds be-

ginning this year, under the new Housing and Community Development Act of August 22, 1974: 42 USC §5301, 88 Stat. 633, et seq. These community development funds are specifically authorized to be used by municipalities for: inter alia, the acquisition of real property which is appropriate for rehabilitation; code enforcement in deteriorated areas; and rehabilitation of buildings and improvements (including interim assistance and financing of rehabilitation of privately owned properties.) See 42 USC §5304.

You have informed us that many municipalities wish to use these community development funds along with any other Federal, State or local funds available, to undertake various programs of rehabilitation of low and middle income housing within their geographical limits. Many questions have been raised by citizens and local solicitors to the legality, under State law and constitution, of our municipalities undertaking these functions.

In general, the municipalities have proposed rehabilitation programs which would employ one or both of the following methods:

1. To acquire (by means other than eminent domain) housing which is presently substandard, to rehabilitate it, and then to resell it to private ownership;

2. To make grants or loans to low and middle income persons who own and reside in their own homes so that these homes may be rehabilitated to meet existing code standards.

## ENABLING LEGISLATION

As a general rule, it is beyond dispute in this Commonwealth that a municipality has no power to enact ordinances except as authorized by the leg-

islature: Taylor v. Abernathy, 422 Pa. 629, 633, 222 A.2d 863 (1966).* Therefore, in order for Pennsylvania municipalities to legally undertake programs of rehabilitation of housing, we must find a specific legislative enactment authorizing them to do so.

In our opinion, the Act of December 10, 1974, P.L. 790 (No. 292), 53 P.S.§5421, et seq., is such a specific statute. Section 1 of the act provides:

"Every municipality may, by passage of an ordinance by its governing body, *in any year expend* all or part of any moneys received as payment to local governments pursuant to Title I of Public Law 92-512, the 'State and Local Fiscal Assistance Act of 1972,' *or its general municipal funds for social service programs for the poor, the disabled, and the aging,* provided such programs do not duplicate although they may expand programs of the Commonwealth or of the United States Government. Nothing contained herein shall prohibit the use of funds in the matching of local funds with State or Federal funds in so far as permitted by law or regulation. Unless contrary to Federal statutes and regulations, no person shall be denied participation in, or the benefits of social service programs so funded because said person is not a public assistance recipient." (Emphasis supplied.)

Section 4 of the act defines "municipality" to include a "county, city, borough, incorporated town, township."

* It would appear that for home rule communities this presumption is reversed so that they may exercise any powers not specifically denied them by the Constitution, their home rule charter or the General Assembly. See Pennsylvania Constitution, article IX, sec. 2. However, this is not essential to our discussion here, especially since Act 292 of 1974 mentions home rule communities specifically.

Section 4 also defines "social service programs" to mean, inter alia:

". . .rehabilitation of low to middle income housing."

While it was the principal intent of Act 292 of 1974 to enable Pennsylvania municipalities to expend Federal revenue-sharing funds for social services programs, the General Assembly also granted the municipalities the power to expend moneys from their general municipal funds for the same programs. It is our opinion, and you are so advised, that for the purposes of Act 292 of 1974, "general municipal funds" include all funds received by the municipal treasurer and subject to the general provisions of the municipal codes for distribution and auditing, whether received from local, State or Federal sources, and whose expenditures are not limited by State or Federal law for a specific purpose other than "social service programs." This, in our opinion, includes Federal Community Development Funds, which, once deposited with the municipal treasurer, become "general municipal funds" for the purposes of Act 292 of 1974. Therefore, these funds may be lawfully expended for the rehabilitation of low to middle income housing, and for such other "social service programs" which are consistent with the allowable use of funds under the Housing and Community Development Act of 1974.

## PENNSYLVANIA CONSTITUTION

Having established that Pennsylvania communities have been granted, as a governmental function, the power to undertake programs of rehabilitation of low to middle income housing, pursuant to Act 292 of 1974, we now turn to the Penn-

sylvania Constitution which, in some ways, limits the exercise of this public power.

Article IX, sec. 9, of the Pennsylvania Constitution provides:

"The General Assembly shall not authorize any municipality or incorporated district to become a stockholder in any company, association or corporation, or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual. The General Assembly may provide standards by which municipalities or school districts may give financial assistance or lease property to public service, industrial or commercial enterprises if it shall find that such assistance or leasing is necessary to the health, safety or welfare of the Commonwealth or any municipality or school district. Existing authority of any municipality or incorporated district to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution, or individual is preserved."

The first sentence of this provision is identical with article IX, sec. 7, of the Pennsylvania Constitution of 1874, except that the word "municipality" has been substituted for the enumeration of all the specific municipal titles. The second and third sentences were added in 1968 when the provision was made into the present section 9 of article IX.

The first sentence is very broad and, at first reading, appears to prohibit the authorization of grant and loan programs for the rehabilitation of an individual's housing. It would also seem to prohibit the municipalities from appropriating their money to such corporations as redevelopment authorities or housing authorities in the furtherance of housing rehabilitation. Excerpting the sentence to read:

"The General Assembly shall not authorize any municipality . . . to obtain or appropriate money for, or to loan its credit to, any corporation . . . or individual," would seem to imply that Act 292 of 1974 is an unconstitutional delegation of authority from the General Assembly to the municipality. However, the history of this constitutional provision, as traced through the opinions of our State Supreme Court, demonstrates otherwise.

Our Supreme Court in Wheeler v. Philadelphia, 77 Pa. 338 (1875), adopted the interpretation of the Supreme Court of Ohio in an opinion construing an identical provision of the Ohio Constitution, as follows:

" 'The mischief which this section interdicts is a business partnership between a municipal or subordinate division of a state, and individuals or private corporations or associations. It forbids the union of public or private capital or credit in any enterprise whatever. In no project, originated by individuals, whether associated or otherwise, with a view to gain, are the municipal bodies named permitted to participate in such manner as to incur pecuniary expense or liability. They may neither become stockholders, nor furnish money or credit for the benefit of the parties interested therein. As this alliance between public and private interests is clearly prohibited in respect to all enterprises of whatever kind, if we hold that these municipal bodies cannot do on their own account what they are forbidden to do on the joint account of themselves and private parties, it follows that they are powerless to make any improvement, however necessary, with their own means, and on their sole account. We may be very sure that a purpose so unreasonable was never entertained by the framers

of the Constitution' ": 77 Pa. at 355-56. See also Commonwealth ex rel. Kelly v. City of Pittsburgh, 183 Pa. 202, 206, 38 Atl. 628 (1897).

In holding that an ordinance adopted by the City Council of Philadelphia, pursuant to enabling legislation, which made a reasonable appropriation to a corporation organized to create a pension fund for city policemen did not violate article IX, sec. 7 (now article IX, sec. 9), the Supreme Court stated:

"It is unnecesssary to outline the history of the constitutional prohibition above quoted. It had its origin in the amendment of 1857, which was prompted by the growing evils of reckless and extravagent municipal subscriptions to railroads, plank roads, etc. Those evils were so aggravated that it became necessary to interfere and prevent by a constitutional prohibition all future pledges of municipal faith and property for such purposes under the sanction of the legislature, which alone possessed the power to grant the proper authority . . . (Citations omitted).

". . .

"It is evident from an examination of our cases on the subject, that no strictly legitimate municipal purpose was intended to be prohibited. The evident purpose of the prohibition was to confine municipalities to the objects for which they were created and to restrain the legislature from authorizing any perversion of them": Commonwealth ex rel. City of Philadelphia v. Walton, 182 Pa. 373, 376, 38 Atl. 790 (1897) (Emphasis supplied).

In overturning a lower court opinion which held that the Act of April 27, 1925, P.L. 305, 53 P.S. §1031, which authorized school districts to insure their buildings with any mutual fire insurance company, was violative of article IX, sec. 7 (now

article IX, sec. 9), of the Pennsylvania Constitution, the Supreme Court stated, inter alia:

"To remedy the evils incident to subscriptions by municipalities to stock of railroads and like enterprises, the constitutional prohibitions against purchases of securities, and pledges of credit, was introduced first into the constitution of 1857, and repeated in that of 1874 . . . The thought was not to prevent the municipal corporation from entering into engagements *to carry out a proper governmental purpose,* though the incurring of indebtedness results . . .": Downing v. Erie School District, 297 Pa. 474, 479, 147 Atl. 239 (1929) (Emphasis supplied.)

In 1938, the Pennsylvania Supreme Court upheld the constitutionality of the Act of June 24, 1937, P.L. 2051 (No. 399), 62 P.S. §2501, repealed which provided for a uniform and comprehensive system of institutional care for the poor, by abolishing poor districts and establishing sixty-seven county boards of assistance. In so doing the court noted:

"It is urged that the act violates the constitution because it provides for appropriations for those who are not dependents and to outside agencies . . . The conclusive answer, however, is that the act has but one subject and embraces only the indigent. It is admitted that there is no prohibition against the use of public moneys for the care and maintenance of such persons (Citations omitted). Furthermore, poor relief being admitted a proper governmental function, Article IX, section 7, does not forbid appropriations to other agencies that aid in carrying it out . . . (Citations omitted)": Poor District Case (No. 1), 329 Pa. 390, 407, 197 Atl. 334 (1938).

Thus, it is clear that article IX, sec. 9, of the Pennsylvania Constitution does not prohibit the

General Assembly from granting to municipalities the authority to make appropriations for, and to implement, such programs as the legislature deems appropriate, whether or not an individual or a corporation benefits therefrom, so long as the program undertaken carries out a proper governmental function. In addition, the Supreme Court has held that this section applies only to transactions with a purely private enterprise, and does not prohibit the appropriation of money to, or the lending of credit for, a public corporation or institution: Rettig v. Board of County Commissioners, 425 Pa. 274, 228 A.2d 747 (1967).

The prohibitions imposed by article IX, sec. 9, of the Constitution may be better understood in light of the following analysis. As noted above, the case of Commonwealth ex rel. City of Philadelphia v. Walton, 182 Pa. 373 (1897), supra, held that municipal contributions to municipal employes' pension funds were not prohibited by article IX, sec. 9. However, compare Walton to the case of Francis v. Neville Township, 372 Pa. 77, 92 A.2d 892 (1952). Neville Township passed an ordinance, allegedly pursuant to The First Class Township Code of June 24, 1931, P.L. 1206, et seq., 53 P.S. §55101, et seq., which authorizes pension systems which provided for a pension to only one named individual who had recently retired from his position of township secretary. In striking down the ordinance of an unconstitutional appropriation of money to an individual (rather than a constitutional pension system for a class of public employes) the Supreme Court noted at page 80:

"Knowing the evils inherent in individual power and authority, the framers of all written democratic constitutions aim at prohibiting grants, monetary

and otherwise to single persons. Unbridled financial chaos would result if municipal bodies were permitted to monetarily reward specific individuals, no matter how praiseworthy their services and how profound their devotion to the welfare of the particular township, board or city."

In 1928, the City of Philadelphia passed an ordinance granting $25,000 to a private corporation called the Civic Opera Company. The opera company did not contract to give any performances nor was the city given in return for the grant any voice in the management of the company, in the participation of its profits or any right to audit the funds. The Supreme Court concluded that the appropriation was not made to sustain any municipal purpose and, therefore, it was an unconstitutional appropriation of public money for the benefit of a private corporation in contravention of article IX, sec. 7 (now article IX, sec. 9): Kulp v. Philadelphia, 291 Pa. 413, 140 Atl. 129 (1928). However, the Supreme Court has held that it is not a violation of article IX, sec. 9, of the Constitution for a City to lease its public auditorium for a nominal rental for limited periods, as authorized by statutes, to a private opera association, even though an admission charge is required. The city was expressly held immune from liability for any deficits that may arise in the course of the conduct of the operatic performances: Bernstein v. Pittsburgh, 366 Pa. 200, 77 A.2d 452 (1951).

## PROPER GOVERNMENTAL PURPOSE

It is clearly the intention of the legislature, as evidenced by its passage of Act 292 of 1974, that the rehabilitation of low to middle income housing be considered a proper governmental purpose to be

undertaken by municipalities. Although subject to judicial review, such legislative intention is entitled to a prima facie acceptance of its correctness by the court: Dornan v. Philadelphia Housing Authority, 331 Pa. 209, 200 Atl. 834 (1938). In addition, the legislature has determined in both the Housing Authorities Law of May 28, 1937, P.L. 955, as amended, 35 PS §1541, et seq., and the Urban Redevelopment Law of May 24, 1945, P.L. 991, as amended, 35 PS §1701, et seq., that it is a legitimate public purpose for the health, safety and welfare of the citizens of the Commonwealth to remove the blighted conditions of unsafe, unsanitary, inadequate or overcrowded dwellings by such means as the rehabilitation of those dwellings. This public purpose has been constitutionally upheld by our Supreme Court. See Dornan v. Philadelphia Housing Authority, supra; Belovsky v. Redevelopment Authority, 357 Pa. 329, 54 A.2d 277 (1947).

Therefore, it is our opinion that the rehabilitation of low to middle income housing by Pennsylvania municipalities is a proper governmental purpose, pursuant to the authorization of Act 292 of 1974, which does not contravene article IX, sec. 9 of the Pennsylvania Constitution.

## REDEVELOPMENT AUTHORITY

You have asked us whether Pennsylvania municipalities may empower local redevelopment authorities to act as agents in implementing programs of housing rehabilitation in their communities. It is our opinion that they may do so.

Under the Urban Redevelopment Law, redevelopment authorities are empowered to undertake programs of "redevelopment." "Redevelopment" is defined to include ". . . carrying out plans for a

program of voluntary repair, rehabilitation, and conservation of real property, buildings or other improvements in accordance with the redevelopment area plan." Therefore, redevelopment authorities are empowered to undertake housing rehabilitation. However, these activities are restricted to redevelopment areas and in accordance with the redevelopment area plan: 35 PS §1703(m).

Section 9(d) of the Urban Redevelopment Law, 35 P.S. §1709(d), empowers redevelopment authorities to "act as agents of the State or Federal government or any of its instrumentalities or agencies for the public purposes set out in this act."

In addition, section 6.1 of the Act of May 24, 1945, P.L. 982, 35 PS §1741, known as the Redevelopment Cooperation Law, provides inter alia:

"The Commonwealth, any state public body or private entity by written agreement approved by the governing body of the city or county, as the case may be, may designate a redevelopment authority as its agent within the authority's field of operation to perform any specified activity or to administer any specified program which the Commonwealth, such state public body or private entity is authorized by law to do: Provided, however, that any such activities or programs shall be in furtherance of the public purposes specified in the Urban Redevelopment Law of this Commonwealth. Such activities may include, without being limited to, redevelopment, renewal, *rehabilitation, housing,* conservation, urban beautification or comprehensive programs for the development of entire sections or neighborhoods." (Emphasis supplied.)

The above-cited sections, in our opinion, provide ample authority for Pennsylvania municipalities to

authorize local redevelopment authorities to act as their agents in carrying out their power under Act 292 of 1974 to provide programs of housing rehabilitation. Pursuant to the powers of the municipalities, these programs may be undertaken on a community wide basis and, therefore, are not limited to redevelopment areas.

Redevelopment authorities have been held to be purely administrative bodies and not "special commissions" or "private corporations" within the meaning of article III, sec. 31 of the Pennsylvania Constitution, which prohibits the legislature from delegating to any special commission or private corporation any power to make, supervise, or interfere with any municipal improvement or to perform a municipal function: Belovsky v. Redevelopment Authority, supra.

## HOUSING AUTHORITIES

You have also asked us whether Pennsylvania municipalities may authorize local housing authorities to be their agents in undertaking their powers of housing rehabilitation under Act 292 of 1974. It is our opinion that they may do so.

Section 2 of the Act of May 28, 1937, P.L. 955, known as the Housing Authorities Law, 35 P.S. §1541, et seq., provides, inter alia, that one of the public purposes for which housing authorities are established is:

"(2) The providing of safe and sanitary dwelling accommodations for persons of low income through new construction or the reconstruction, restoration, reconditioning, remodeling or repair of existing structures": Act of December 22, 1965, P.L. 1167, 35 P.S. §1542.

Section 22.1 of the act, as added by the Act of June 5, 1947, P.L. 449, 35 P.S. §1562.1, provides, inter alia:

"In addition to the powers conferred upon an authority by other provisions of this act, an authority is empowered to act as agent of the state, or any of its instrumentalities or agencies, for the public purposes set out in this act."

In addition, the Act of May 26, 1937, P.L. 888, known as the Housing Cooperation Law, 35 P.S. §1581, et seq., authorizes Pennsylvania municipalities to expend such of their funds as they deem appropriate in aiding and cooperating with housing authorities in the exercise of the work or undertakings of any such authority.

Like redevelopment authorities, housing authorities have been held not to be special commissions or private corporations within the meaning of Article III, sec. 31, of the Pennsylvania Constitution: Dornan v. Philadelphia Housing Authority, supra.

Therefore, Pennsylvania municipalities may lawfully authorize local housing authorities to act as their agents in undertaking their programs of housing rehabilitation.

## NONPROFIT CORPORATIONS

You have asked us whether a municipality may lawfully authorize a nonprofit corporation to undertake the housing rehabilitation program. Our answer to this question would depend on the specific factual situation of each municipal program. In general, private corporations may only be authorized to undertake the mere details of administration.

Article III, sec. 31, of the Pennsylvania Constitution provides, inter alia:

"The General Assembly shall not delegate to any special commission, private corporation or association any power to make, supervise, or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever."

This section has been held to extend to municipal governments as well as the General Assembly (Robinson v. Philadelphia, 400 Pa. 80, 161 A.2d 1 (1960)), and to apply to proprietary as well as governmental functions: Lighton v. Abington Township, 336 Pa. 345, 9 A.2d 609 (1939).

In general, the nonprofit corporation would only be able to undertake factfinding and other purely administrative functions. The program itself should be conducted under the direct supervision of a public body or public officer. Adequate standards must be established for the implementation of the program by the legislative body of the municipality and all acts must have the required approval of that elected body.

We would suggest that the solicitor for the municipality carefully scrutinize any plans which would include the use of a nonprofit corporation in undertaking a program of public housing rehabilitation to insure that it does not violate the terms of article III, sec. 31.

## SPECIFIC PROGRAMS

We do not attempt herein to outline or discuss the details of the many possible means by which municipalities may decide to implement their programs of housing rehabilitation. The specific de-

tails of each program should be reviewed by the municipal solicitor for other legal difficulties and requirements. We do note that all Pennsylvania municipalities have the power, pursuant to their municipal codes, to acquire and sell (by means other than eminent domain) real property. However, in so doing, the municipalities must follow the procedural requirements of their enabling legislation.

In addition, we note that rehabilitation of housing is authorized only for low and middle income citizens. Therefore, municipal programs of housing rehabilitation must have reasonable income limitation standards.

To alleviate other possible legal problems, we recommend that rehabilitation loan and grant programs be limited to owner occupied dwellings.

## CONCLUSION

For the above-stated reasons, we are of the opinion, and you are hereby advised:

(1) That Pennsylvania municipalities have the power, pursuant to Act 292 of 1974, to undertake programs of rehabilitation of low to middle income housing within their boundaries;

(2) That article IX, sec. 9, of the Pennsylvania Constitution does not prohibit such housing rehabilitation programs;

(3) That municipalities may authorize public bodies such as redevelopment authorities and housing authorities to act as their agents in implementing housing rehabilitation programs; and

(4) That nonprofit corporations may be authorized by municipalities to assist in housing rehabilitation programs only to the extent of providing administrative services.