R. K. STEWART, THOMAS C. COWLEY, SIMON E. O. MEYER, PAUL LAVERENTS and R. A. MORTON, Plaintiffs,

v.

THE CITY OF CHEYENNE, a Municipal Corporation, IRA L. HANNA, Mayor, GUS E. FLESCHLI and BRUCE JONES, Commissioners of the City of Cheyenne, Wyoming, BOARD OF PUBLIC UTILITIES, WILLIAM A. NORRIS, WILLIAM J. DINNEEN, JOHN U. LOOMIS, DON H. WAGEMAN and FRED E. WARREN, Members of the Board of Public Utilities of said City of Cheyenne, Wyoming, Defendants.

(No. 2310; Dec. 13, 1944; 154 P. 2d 355)

498

For the plaintiffs there was a brief and also oral argument by Clyde M. Watts and Howard B. Black, both of Cheyenne, Wyoming.

For the defendants there was a brief and also oral argument by Edward. T. Lazear and Carleton A. Lathrop, both of Cheyenne, Wyoming.

500

502

## OPINION

BLUME, Justice.

This action was brought by the plaintiffs herein as taxpayers of the City of Cheyenne, in the District Court of Laramie County, to determine the constitutionality of Chapter 109, S.L. 1943, which permits the establishment of a Board of Public Utilities. Chapter 1 of the legislative act provides that every city having a population of 10,000 and which operates municipal water works may establish a board of commissioners to be known as the Board of Public Utilities, and that when such Board has been appointed and established that it shall not be abolished except by a majority vote of the qualified electors at a regular city election. Section 2 provides that the Board of Public Utilities shall consist of five members to be appointed by the mayor with the advise and consent of the city council. One member of the Board shall be appointed for a term of two years, two for a term of four years, and two for a term of six years. Thereafter each member of the Board shall be appointed for a term of six years, provided that any member of said Board may be sooner removed for cause other than politics or religion,

after public hearing, by the mayor, the council concurring. Section 3 provides that the Board of Public Utilities shall elect a president and secretary from their own number and shall hold meetings once a month. Three members shall constitute a quorum for the transaction of business. The salaries of the members of the Board shall be $600.00 per annum. The members of the Board shall be men of business experience and not less than thirty years of age, citizens of the United States, and residents in the City for five years immediately preceding their appointment. Section 4 of the act provides that the Board of Public Utilities shall have the exclusive control of all municipally owned water works; that it shall hire and discharge all employees, agents and officers of the water department and fix their compensation; that it shall purchase all machinery and appliances necessary for the purposes of the department and may, in the name of the City, take and hold by lease, purchase or otherwise, franchises on real and personal property as may be needful or convenient for carrying out the purposes for which the Board is established. It shall establish all reasonable rules and regulations to protect the rights and property vested in the City; may issue vouchers or warrants in payment of all claims and accounts; it shall have power to provide for either civil service status or a pension system and may withhold 2 per cent of the wages of the employees to be placed in the water department pension fund. The Section further provides that: "It shall be the duty of the governing body of the city, when requested by the Board of Public Utilities, to enact such ordinances as may be deemed necessary by said Board for the protection of such water plant and to institute condemnation proceedings whenever in the judgment of said Board private property should be taken in the name of the City for said utility purpose." Section 5

provides that the Board of Public Utilities shall select and appoint a superintendent of the water plant and fix his salary at not exceeding $3,600.00 per annum. Such superintendent shall supervise and inspect all parts of the plant and see that they are maintained in good condition for use, and that all employees attend to their respective duties. All officers, employees, servants and agents of the water plant, when appointed by the Board shall be under his immediate control and management. Section 6 provides that the Board of Public Utilities shall select and appoint an office manager at a salary to be fixed by the Board; such office manager to give a bond in a sum fixed by the Board conditioned for the faithful performance of his duties. The Board shall appoint such assistants to the office manager as it deems necessary. The Section further provides that: "It shall be his (the office manager's) duty immediately following the close of each month to make a complete report to the Board, and to the governing body of the city, showing the transactions of the preceding month and the financial condition of the water department. Such report shall include a correct account of all collections, appropriations, expenditures, and approved claims entitled to payment." Section 7 provides that the Board shall make all appointments and hire all officers, agents, servants and employees of the water department and fix their compensation and determine their qualifications. All appointments shall be on the basis of merit alone. Section 8 provides that the Board of Public Utilities shall fix such rates for the water furnished to consumers as will secure an income sufficient to pay the interest charges and principal payments on all bonds issued; to pay the purchase price, construction costs, extension and enlargements of the water system as the same become due, and to pay all salaries and wages of all officers and employees of the department, and to pay

all miscellaneous expenses. The Board may fix special rates for water furnished to the governing body of the city or town for public purposes. Section 9 provides that any surplus funds arising from the sale of water shall be paid partially into a water plant depreciation fund. Part of the funds may be used for the purchase and cancellation from time to time of any bonds of the city issued to pay the purchase price of the water plant or the cost of construction, extension and enlargement thereof. Any surplus over and above these requirements shall be paid into the general fund of the city. Section 10 provides that the City Treasurer shall be ex officio treasurer of the Board of Public Utilities, and shall pay the warrants issued by the Board. Section 11 provides that the Clerk of the City shall furnish the Board of Public Utilities with a copy of all ordinances, resolutions, agreements, contracts and other records as the Board may require. Section 12 provides that whenever the Board of Public Utilities deems it neecssary and expedient to vote bonds for the extension or improvement of the municipally owned plant for the purpose of supplying such city and its inhabitants with water it shall be the duty of the mayor of the city, within thirty days after receiving written request from the Board, to issue a proclamation for holding an election to vote on bonds in the amount requested by the Board, and that the bonds, if voted by the election, shall be issued accordingly. Section 13 provides that all other powers and duties under acts and parts of acts relating to water plants in such cities and towns in so far as applicable shall be exercised by the Board of Public Utilities. Section 14 of the act provides that if any provision in the act shall for any reason be held invalid it shall not affect the remainder of the act.

The plaintiffs allege that the defendants are the Mayor and the Commissioners of the City of Cheyenne and that the other defendants are the members of the Board of Public Utilities, appointed by the Mayor and Commissioners of the City of Cheyenne; that pursuant to the legislative act above mentioned the City Commissioners on April 27, 1943, adopted an ordinance establishing in the City of Cheyenne a Board of Public Utilities and thereupon appointed the five members of the Board; that the legislative act conflicts with certain provisions of the Constitution. They asked that the court enter a judgment herein declaring the legislative act hereinbefore mentioned, and the ordinance passed in pursuance thereto, to be unconstitutional and void and to restrain the Board of Public Utilities and each member thereof from operating or interfering with the water works system or department of the City. An answer was filed in the case admitting that the City of Cheyenne is a municipal corporation; that the legislative act above mentioned was passed, and that the City passed an ordinance in pursuance thereof and appointed five members of the Board of Public Utilities. Upon motion of both plaintiffs and defendants herein the District Court thereupon submitted to this court certain constitutional questions, namely: First. Whether or not the legislative act above mentioned, or any section thereof, is in violation of Section 37, Art. III of the Constitution of Wyoming, which provides that: "The legislature shall not delegate to any special commissioner, private corporation or association, any power to make, supervise or interfere with any municipal improvements, moneys, property or effects, whether held in trust or otherwise, to levy taxes, or to perform any municipal functions whatever." Second. Whether or not Section 4 (evidently meaning Section 6) of said legislative act is also in conflict with Section 1, Art.

XIV of the Constitution of Wyoming, which provides: "All state, city, county, town and school officers, excepting justices of the peace and constables in precincts having less than fifteen hundred population, and excepting court commissioners, boards of arbitration and notaries public, shall be paid fixed and definite salaries. The legislature shall, from time to time, fix the amount of such salaries as are not already fixed by this constitution, which shall in all cases be in proportion to the value of the services rendered and the duty performed." Third. Is the ordinance adopted by the City of Cheyenne above mentioned in conflict with Section 37, Art. III above mentioned and with Section 1, Art. XIV of the Constitution, above mentioned, or in violation of Section 1, Art. I of the Constitution of Wyoming, providing that: "All power is inherent in the people, and all free governments are founded on their authority, and instituted for their peace, safety and happiness; for the advancement of these ends they have at all times an inalienable and indefeasible right to alter, reform or abolish the government in such manner as they may think proper."

While the case has been submitted to us upon specific constitutional provisions, counsel for plaintiffs insist that we should consider the case from a broader standpoint, and they rely to some extent upon what has been referred to as implied limitations upon the power of the legislature to interfere with affairs of municipalities which are purely local. There is no doubt that the ownership and control of water works by municipalities is generally considered by the courts as purely a local affair, and as owned and controlled by them in their proprietary capacity (McQuillan, Municipal Corporation, Sec. 196), although it may be mentioned that the validity of the distinction of what it

does in its governmental and in its proprietary capacity has been questioned. 22 Va. Law Rev. 910-944. Counsel rely, in the main, upon the rules formulated by Judge Cooley in People v. Hurlbut, 24 Mich. 44, and Board of Park Commissioners v. Detroit, 28 Mich. 22. Judge Cooley there pointed out that municipalities existed before the adoption of any constitutions; that the right of local self-government is one of immemorial rights; that the very existence of government depends thereon, and that, accordingly, the legislature has no right to deprive them thereof. He stated in the Hurlbut case (24 Mich. 44, 104) that "conceding to the state the authority to shape the municipal organizations at its will, it would not follow that a similar power of control might be exercised by the state as regards the property which the corporation has acquired, or the rights in the nature of property which has been conferred on it. * * * The municipality, as an agent of government, is one thing; the corporation, as an owner of property, is in some particulars to be regarded in a very different light." Continuing in the same Volume on p. 108, he states: "The state may mould local institutions according to its views of policy or expediency; but local government is matter of absolute right; and the state cannot take it away. It would be the boldest mockery to speak of a city as possessing municipal liberty where the state not only shaped its government, but at discretion sent in its own agents to administer it; or to call that system one of constitutional freedom under which it should be equally admissible to allow the people full control in their local affairs, or no control at all." Among other cases, asserting the inherent right of local self-government, are State et rel. v. Barker, 116 Iowa 96, 89 N.W. 204, 93 A.S.R. 222, 57 L.R.A. 244; State ex rel. v. Moores, 55 Neb. 480, 76 N.W. 175, 41 L.R.A. 624;

City of Lexington v. Thompson, 113 Ky. 504, 68 S.W. 477; Hasbrouck v. Milwaukee, 13 Wis. 37; Thomas v. Reid, 142 Okla. 38, 285 P. 92; City of Ardmore v. Excise Board of Carter County, 155 Okla. 126, 8 P. 2d 2; Bartlesville Water Co. v. Brann, 166 Okla. 251, 27 P. 2d 345. Most of the courts take a contrary view, and deny that there is any implied limitation on legislative control. McQuillin, Municipal Corporations (2d Ed. Revised) Section 268. Gray, Limitations of Taxing Power, sums up the theory as follows (Section 651, p. 323):

"When we consider that in many matters, already noted, all parties concede the legislative supremacy; that there are but few matters of such purely local interest that some color of general interest may not be asserted to justify legislative interference; that the rules of construction require the courts to strain interpretation, if necessary, in order to uphold legislative action; that, in nearly every case of legislative interference with local affairs there is a strong party in the locality itself upholding such interference; and, finally, that constitutional amendments and revisions have been so frequent in recent years that the omission from a constitution of express restrictions in any respect may fairly be regarded as intentional, it must be admitted that those who deny the existence of implied limitations preventing the legislature from exercising compulsion in local taxation, have, practically, the best of the argument."

That local self-government—tracing, as McQuillin says, its origin as far back as the Aryan village communities—is the foundation-stone of constitutional liberty, can scarcely be doubted. And we admit that the question has assumed peculiar importance in view of the alarmingly growing bureaucracy of the Federal Government, and its control of the minutest affairs of our people. The steps taken in that direction are so insidious, that it is often unnoticed even by those who have the time and the ability to comprehend its cank-

erous evil, and is aided and abetted, by ignoring it, by many good men, who, knowing that it is gnawing at the vitals of our people, choose, for one or another reason, to let it take its headlong and heedless course toward utterly destroying our liberties, just as the same unchecked evil made serfs of the major portion of the people of the Roman Empire and sapped its vitality. See Dill, Roman Society, Last Century of the Western Empire, 250 et seq. We deplore the evil, and know its origin. The French have an ancient proverb saying "chacun pour soi, Dieu pour nous tous"—each for himself and God for us all—to indicate that many persons, pursuing their own ends, often refuse to consider the interests of all, and blandly decline to take cognizance of a threatening danger hanging over us all. Whether or not the evil extends down to municipal government in a comparatively sparsely settled state like ours, is another question, at least as long as capable and high-minded men of the eminent character as the men constituting the Board of Public Utilities, of Cheyenne, are conceded to be. can be induced to occupy such positions. Water Boards, as independent as, or perhaps more independent than, the Board of Public Utilities enabled to be created by the statute here under consideration, were upheld in David v. Portland Water Committee. 14 Or. 98, 12 P. 174, and Coyle v. McIntyre, 7 Houst. (Del.) 44, 30 Atl. 728, 40 Am. St. Rep. 109. In these states, however, the legislature were not hampered by constitutional provisions which we have in this state. We must give effect to local self-government, in so far at least as required by our constitution, at the same time remembering that it is our duty to uphold a legislative act, in so far as that is reasonably possible. We shall, as we have been asked, discuss the case from a broad standpoint, since that seems to be necessary to understand the direct ques-

tions involved herein. We should mention, in passing, that the constitutional convention of this state did not ignore the question of local self-government. Section 27, Art. III of the Constitution provides that the legislature shall not pass special laws creating offices or prescribing the powers or duties or officers in cities. Section 1, Art. XIII provides that general laws shall be passed for the organization of municipalities, and that they shall be limited to four classes. These provisions were enacted so as to check and limit the interference of the legislature in the affairs of municipalities, which appears to have become a positive evil during the nineteenth century, as attested by various authors writing on the subject of municipalities. See, for instance, Parsons—"The City for the People," and Goodnow—"Municipal Home Rule." We shall consider Section 37, Art. III of the Constitution later in the opinion. It should be mentioned that Cheyenne operates under a commission form of government, electing the mayor and the commissioners, and that the City owns its water works.

I. General Control of Municipalities by Legislature.

The legislature has controlled municipalities granting it whatever powers they have from the very beginning of the existence of Wyoming. The territorial legislature granted a special charter to the City of Cheyenne by an act approved December 10, 1869. Laws of Wyo., 1869, p. 694. It repealed that enactment on December 15, 1877, but granted another special charter to Cheyenne by an act approved December 14, 1877. Laws of Wyo., 1878, p. 37. It amended that charter by subsequent laws. The legislature incorporated the City of Laramie by an act approved December 12, 1873, and amended that charter by a law approved December 15, 1877. Laws of Wyo., 1878, p. 51. Other special charters were subsequently granted to Evans-

ton, Buffalo, Sheridan and Rawlins, and in 1886 an act was passed for the general incorporation of towns. Laws, 1887, Section 445-497, incl. Other laws have been passed in connection with the incorporation of cities of first class and cities of the second class and amendments to these laws have been passed from time to time by the legislature. It is, accordingly, noted that it has been recognized from the very beginning of Wyoming that the legislature has the right to prescribe the powers and the duties of municipalities and these include not only governmental affairs but strictly local affairs as well. A similar situation has prevailed in other states so that Cooley on Constitutional Limitations, the same author who wrote the opinions in the Michigan cases heretofore cited, has formulated the following rule (Eighth Ed., Vol. 1, p. 391):

"The people of the municipalities, however, do not define for themselves their own rights, privileges and powers, nor is there any common law which draws a definite line of distinction between the powers which may be exercised by the State, and those which must be left to the local government. The municipalities must look to the State for such charters of government as the legislature shall see fit to provide; and they cannot prescribe for themselves the details, though they have a right to expect that those charters will be granted with a recognition of the general principles with which we are familiar. The charter, or the general law under which they exercise their powers, is their constitution, in which they must be able to show authority for the acts they assume to perform. They have no inherent jurisdiction to make laws or adopt regulations of government; they are governments of enumerated powers, acting by a delegated authority; so that while the State legislature may exercise such powers of government coming within a proper designation of legislative power as are not expressly or impliedly prohibited, the local authorities can exercise those only which are expressly or impliedly conferred, and subject to such regulations or restrictions as are annexed to the grant."

This quotation was cited by us with approval in May v. City of Laramie, 58 Wyo. 240, 271, 131 P. 2d 300, where we held that a municipality did not have the right to provide for its own powers but that the grant of such powers is the function of the legislature.

II. Control by the Legislature of the Creation of Officers.

The legislative act in question here granted to the governing body of the City the power to create the Board of Public Utilities and appoint the officers thereof, and it further provided, as above mentioned, that the Board should not be abolished except by a vote of the people. It is contended herein that the selection of these officers, and the creation of the Board itself, should have been left to a vote of the people. We shall consider these questions in their order.

So far as we have been able to find there is no authority for the contention, except in connection with taxation, that the legislature is required to leave the selection of officers or employees of a city to a vote of the people. The Michigan cases cited by plaintiff do not hold. The authorities seem to be harmonious that the legislature has the right to determine the manner in which the selection shall be made. Thus, McQuillin, Municipal Corporation, supra, Section 199, states that unless restricted by the constitution, the general doctrine is that the legislature is free to create municipal offices, prescribe the qualifications of those who fill them, provide the method of selection, and prescribe that certain officers may be chosen by the municipal voters by election and that others may be appointed either by the local authorities or by the state. The only question is as to whether or not the

state has the right to make the selection of these officers and it was held in People v. Hurlbut, supra, that that could not be done, except temporarily. It may be conceded that this is the correct rule, and was so recognized in the case of Com. v. McElwee, 327 Pa. 148, 193 Atl. 628, under a constitutional provision such as Section 37, Article III of our Constitution. See also State v. City of Elizabeth, 66 N.J.L. 484, 49 Atl. 1106. McQuillin, supra, Section 198. The contrary was held In Re Senate Bill, 12 Colo. 188, 21 P. 481. That State, too, has a constitutional provision like Section 37, Art. III, supra, but it has a further constitutional provision that "the general assembly shall provide for the election or appointment of such * * * other municipal officers as public convenience may require." The point, however, is not involved in this case, for the legislature in this case left to the city's governing board the selection of the officers or employees of the Utility Board which it created by the legislative act in question. In the case of People v. Pollock, 306 Ill. 358, 137 N.E. 820, the court said, among other things:

"The constitution has provided for the election of many officers. It contains no general provision for the election of all officers. Many State officers, county officers and district officers must be elected, but there is nothing in the constitution requiring all municipal officers or school officers to be elected. * * * There are no home-rule provisions in our constitution which require municipal officers to be elected by a vote of the municipality. * * * The power to appoint to office is an attribute of sovereignty, which can be exercised by municipal corporations only by virtue of a grant from the sovereign power. The legislature may grant to a municipal corporation the right to elect or appoint its own officers in such manner as the legislature sees fit, or to elect some officers and appoint others, or to determine whether certain offices shall be filled by election or appointment, and to fill them accordingly."

In Covington Bridge Co. v. City of Covington, 257 Ky. 813, 79 S.W. 2d 216, in which the court apparently approves of the statement of Judge Cooley in People v. Hurlbut, supra, the court said in part:

"The authorities agree without exception that the Legislature has power to regulate, increase, or diminish the duties of a municipal officer, subject, however, to the limitations that the functions conferred upon him by the Constitution, either expressly or impliedly, cannot be transferred to another. * * * The Legislature may create municipal boards, commissions, and offices not mentioned in the Constitution, fix their qualifications, and define their powers and duties, * * * and grant to the municipality the authority to elect or appoint the incumbents in such manner as the Legislature sees fit and determine whether they shall be filled by election or appointment by the city and to fill them accordingly. * * * It may also transfer the powers and duties of one office from one body of local officers to another local body, except, as we have indicated, it may not divest an office created by or named in the Constitution of its original and inherent functions."

So it was held in Metropolitan R. R. Co. v. District of Columbia, 132 U. S. 1, that: "All municipal governments are but agencies of the superior power of the State or government by which they are constituted, and are invested with only such subordinate powers of local legislation and control as the superior legislature sees fit to confer upon them. The form of those agencies and the mode of appointing officials to execute them are matters of legislative discretion." See also Barnes v. Dist. of Columbia, 91 U. S. 540; McKenzie v. Wilson, 31 Haw. 216. In 43 C.J. 737, it is said: "Unless restrained by the constitution, the legislature may prescribe the method of appointment or election of members of municipal boards or departments. * * * A city council empowered to create a commission necessarily possesses the incidental power

to determine how its members should be chosen, whether by appointment by the mayor with or without confirmation by either or both branches of the city council, or in any other reasonable and legal way."

III. Power to Create Board of Public Utilities.

As heretofore mentioned it is contended by counsel for plaintiffs that the people should have been given the right to vote as to whether or not the Board of Public Utilities should be created. There does not seem to be any authority to sustain that contention, and none has been cited by counsel. In 43 C.J. 350, it is stated that: "The department of building and its officers may be created by the municipal governing body when the latter is authorized to do so or by direct statutory provision." That rule would seem to be applicable to other boards. So it is said in 43 C.J. 353, that a board of appeal and adjustment may be created by direct force of statute or by the municipal governing body under duly delegated authority. See also 43 C.J. 736 and cases cited. McQuillin, supra, Section 445, stated:

"What offices, departments, boards and commissions, exist and what may be created and what may be abolished, and what authority may create and abolish, of course, must depend on the particular charter and the state laws applicable. Departments of finance, fire, police, health, public works, parks, water, lighting, street, sewer, harbor and wharf, docks, education, charities and correction associated with the municipal government are common. * * * As heretofore pointed out, in the absence of constitutional provisions restricting the power of the state legislature, the form of the municipal organization and the manner in which the municipal powers shall be distributed and what departments and officers shall execute and administer them are matters wholly within the discretion of the legislature. * * * As stated, whether or not a municipal corporation has power to create offices and departments, boards, commissions, and similar bodies,

and change and abolish them, depends chiefly upon the provisions of its charter and legislative acts applicable."

In Wheelock v. Lowell, 196 Mass. 220, 81 N.E. 977, 13 Anno. Cases 1109, the court stated:

"The city council of Lowell has the same power, as to matters not specifically covered by statute, to create committees or commissions of citizens for the performance of municipal functions, possessed by towns in town meeting. * * * A broad power in this respect has always been exercised by towns."

In that case the commission in question was created by an ordinance of the municipal authorities pursuant to a statute. State v. Hardy (La. App.), 144 So. 519, is an interesting case. The dispute in that case was as to whether the mayor or the department of public utilities should have charge of Cross Lake, the source of the water supply of the City of Shreveport. Under the law the city council was vested with power to cretae the various boards of the city and invest them with such power as to it might seem best. The court of appeals held that under this provision the council could not delegate to a plebiscite the power to create any boards. The case came before the Supreme Court as shown in 177 La. 147, 148 So. 674. And it appears that subsequent to the original creation of the departments, an ordinance was submitted to a plebescite, authorized by law, whereby the people gave the authority over Cross Lake to the mayor, and it was held that this enactment governed, and the holding of the court of appeals was reversed. It may be noted that the only reason for the reversal of the case was because of the fact that the ordinance adopted by the people was valid because of express statutory power to submit the ordinance to them. In Vallelly v. Board of Park Com'rs., 16 N. Dak. 25, 111 N.W. 615, it appears that the legislature enacted a law creating a park com-

mission and giving authority to the council to adopt the law. It was contended that the question of the adoption of the law should have been left to a vote of the people, but the court held otherwise. The Michigan cases are in no way in conflict. The Hurlbut case merely decided, as already stated, that the legislature could not appoint the members of a board created by it, except temporarily. The case of Board of Park Commissioners v. Detroit, supra, merely decided that the legislature had no right to delegate to the Park Commissioners the power to determine absolutely, without reference to the council of the City of Detroit, as to whether or not bonds of the City should be issued to pay for grounds purchased for parks. In both cases it appears that the legislature created the board. The power to do so was not questioned, and judging from the excerpts of Judge Cooley, already set out, he conceded the power of the legislature to do so. If it may do so directly, it follows that it may do so through such agency as it may select. See also Moll v. Morrow, 253 Pa. 442, 98 Atl. 650; Covington Bridge Co. v. City of Covington, supra.

IV. It is claimed that Section 6 of the legislative act in question is in violation of Section 1, Art. XIV of the Constitution, in view of the fact that the office manager's salary has not been fixed by the legislature. Section 1, supra, provides that state, city, county, town and school officers shall be paid fixed and definite salaries. Counsel cite in support of this contention, State v. Sheldon, 29 Wyo. 233, 213 P. 92. We do not think that the case is in point. It is difficult at times to determine whether a particular person is an officer or an employee. 43 C.J. 596. In this case we think that the office manager, who is under the control of the Board of Public Utilities, is an employee. That has been decided under a legislative act similar to that

involved in this case. Moore v. Logan, (Tex. Civ. App.) 10 S.W. 2d 426, 437, where the court stated that, "the superintendent of Public Utilities is not an officer but an employee."

V. We come then to the consideration of Section 37, Art. III of our Constitution. For convenience we shall set it out again. It provides:

"The legislature shall not delegate to any special commissioner, private corporation or association, any power to make, supervise or interfere with any municipal improvements, moneys, property or effects, whether held in trust or otherwise, to levy taxes, or to perform any municipal functions whatever."

The following states have a similar constitutional provision, namely: Colorado, Section 35, Art. V; Montana, Section 36, Art. V; Pennsylvania, Section 20, Art. III; South Dakota, Section 26, Art. III; Utah, Section 29, Art. VI; and California, Section 13, Art. XI. In these states the constitutional provision mentions a special "commission" instead of "commissioner" as our constitution. We take it, however, that the meaning of all of these constitutional provisions is the same.

We have numerous authorities which have passed upon the constitutoinal provision here in question. Nearly fifty cases on it have been decided in the various courts of Pennsylvania alone, so that we have ample guides in arriving at the correct solution herein. We might mention at this point that some of the cases cited by the defendants herein are not in point. That is true for instance with Milheim v. Moffat Tunnel Improvement Dist., 72 Colo. 268, 211 P. 649; Tranter v. Allegheny Co., 316 Pa. 65, 173 Atl. 289; Dornan v. Philadelphia Housing Authority, 331 Pa. 209, 200 Atl. 834. These cases involved a legislative grant of power to a body, such as a self-liquidating public

authority to manage public property pending improvement or development, which did not have the power to incur debts for which the city was liable and could not interfere with municipal property. See Porter v. Board, 43 Dist. & County Rep. (Pa.) 616. The case of Town of Holyoke v. Smith, 75 Colo. 286, 226 P. 159, is distinctly contrary to the contention made by the defendants herein. The Colorado case, In Re Senate Bill, supra, merely decides, aside from that already mentioned, that a board appointed by the Governor, may perform administrative duties, and thus spend money furnished by the city or coming from special assessments levied by the city.

A. As stated before, counsel for the plaintiffs have laid stress on the difference between governmental functions of a municipality and purely local affairs. In California and Montana the courts seem to take the view that the constitutional provision applies to local affairs only. In Re Pfahler, 150 Cal. 71, 88 P. 271, 277; State ex rel. v. Cook, 84 Mont. 478, 276 P. 958. See also Salt Lake County v. Salt Lake City, 42 Utah 548, 134 P. 560. A contrary position has been taken by the Supreme Court of Pennsylvania in the case of Lighton et al. v. Abington Twp. et al., 336 Pa. 345, 9 Atl. 2d 629, in which the court stated as follows:

"It has been suggested that, while the conclusion reached would be correct if the operation of the sewerage system were a governmental instead of a proprietary activity, Article III, section 20, does not apply because a proprietary function is under consideration. But the constitution makes no such distinction; the words are plain and must be given their common or popular meaning, for in that sense, the voters are assumed to have understood them when they adopted the constitution: Busser v. Snyder, 282 Pa. 440, 449, 128 A. 80. The section prohibits delegating to any private corporation 'any power to make, supervise or interfere with any municipal improve-

ment, money, property or effects whether held in trust or otherwise or to levy taxes or perform any municipal function whatever.' There are no words, on the one hand, restricting the prohibition to property, etc., used for purely governmental purposes and, on the other, allowing the delegation for property, etc., employed in proprietary capacities. Both classes of municipal activity were familiar when the constitution was adopted. The sewerage system is a municipal improvement; it is property belonging to the municipality; in whatever capacity used, whether governmental or proprietary, the words of section 20 expressly include it; we must give them effect."

It is not necessary to decide herein whether or not the constitutional provision applies to local affairs only, but also to governmental affairs, since the case at bar involves water works which, as already stated, is generally considered to be a matter involving strictly a local affair.

B. Taxation. To continue, we shall first consider the subject of taxation. It has been stated in a number of cases that one of the purposes of the constitutional provision in question was to vest the power to incur debts in the same body which could provide for taxation and to prevent the separation of these powers. Tranter v. Allegheny Co., supra. Thus it was stated in Porter v. Board, 43 Dist. & County Rep. (Pa.) 616, 621, as follows:

"Article III, sec. 20, was drafted and adopted to avoid repetition of the unhappy experiences with commissions which, though not a part of the city government, were given power to handle municipal projects and spend money and incur public indebtedness in the exercise of that power. To be free to spend without the power or worry of getting the money to spend, and to be free of restraint by the taxing power, means trouble and vexation when payment must be provided."

See also Poor Dist. Case No. 1, 329 Pa. 390, 404-405, 197 Atl. 334.

Section 4 of the legislative act in question provides that the governing board of the city shall commence condemnation proceedings upon demand of the Board of Public Utilities and Section 12 provides that upon such demand the governing board of the city shall call an election as to whether or not bonds of the city shall be issued. Condemnation proceedings may involve the taxing power of the city, and that power is certainly involved when bonds are issued. While the authorities are not altogether uniform (1 Cooley, Taxation, 4th Ed., p. 204), it has been held by a number of authorities without reference to the constitutional provision here in question that no tax can be levied by officers who are only appointed and have not been elected by the people. State ex rel. v. Mayor of Des Moines, 103 Ia. 76, 72 N.W. 639, 39 L.R.A. 285; Vallelly & Brockhoff v. Park Com'rs., 16 N.D. 25, 111 N.W. 615, 15 L.R.A. 61. Parks v. Board, 61 Fed. 436; Inhabitants of Township of Bernards v. Allen, 61 N.J.L. 228, 39 Atl. 716. Schultes v. Eberly, 82 Ala. 242, 2 So. 345. That also was held in State v. Edwards, 42 Mont. 135, 111 P. 734, although in that case the court did not expressly refer to the constitutional provision here in question. The case cites other authorities in point. In Wilson v. School District, 328 Pa. 225, 195 Atl. 225, 113 A.L.R. 1401, the court held that an act of the legislature which committed to an appointed school board, acting for a school district, the power to levy taxes, without fixing a maximum amount, is unconstitutional and in violation of the constitutional provision here in question. It specifcally held that the legislative power to tax cannot be conferred upon an appointed body. The court said on that point, after discussing the whole question of delegation of taxing power, as follows:

"Another objection to the Act of 1929 is that it is unconstitutional because of article 3, § 20. This sec-

tion prohibits the delegation to any special commission of the Legislature's power to tax. The purpose of the provision was to protect against the exercise of the taxing power by officials not subject to the control of the people. This prohibition is not limited solely to municipal taxation. The words 'to levy taxes' are not modified by the word 'municipal,' whereas the remaining clauses in this section are specifically so modified. This demonstrates the intention of the framers that no taxing power whatever, state or municipal, be delegated to any special appointive commission. The section becomes an express and emphatic limitation on the power of the Legislature to delegate to a non-elective board or commission the power to tax. But it is urged the school board is not a 'special commission,' because at the time the Legislature invested it with taxing power, it was an existing governmental body or agency, regularly constituted and exercising general administrative powers in connection with the public school system of the state. It is quite true it was such a body or agency and could lawfully exercise all the legitimate powers granted to it, whether or not it is a special commission for such purposes. It is the established governmental agency for the administration of the educational system. But when the taxing power was lodged in it, it was quoad that power a special appointive commission. It must be remembered that the taxing power is a separate special power, and is not a component part of the power to educate. When an appointive school board, which is a board of education, is empowered to levy taxes, it is a special commission to levy taxes."

Com. ex rel. v. Smith, 9 Dist. & County Rep. (Pa.) 350, and Keller v. Westgate, 10 Dist. & County Rep. (Pa.) 240, involve the same principle. In these cases "sidepath commissioners" were appointed by the court of Quarter Sessions to construct and maintain sidepaths in a township—the township being considered a municipality. Under the law, the county commissioners, elected by the people, were required to levy a tax to be turned over to the sidepath commissioners.

It was held that the commissioners were not required to levy the tax, and could not legally do so, since the sidepath commissioners were a special commission performing municipal functions.

Counsel for the defendants argue that the case at bar does not involve any question of taxation. It is true, that it does not do so directly, but it does so indirectly. The statute directs that the governing body of the city must condemn property whenever directed by the Board of Utilities. Such a mandatory provision is equivalent to a grant to the Board to condemn. No Limitation on such proceedings is found. The act does not say that the indebtedness which wpuld be incurred by such condemnation proceedings shall not be an indebtedness of the City, or even that the amount to be paid shall be limited to the amount of money in the water fund. It may well be, then, that the amount to be paid would have to be paid by taxation. Hence, the grant to incur such indebtedness is the equivalent of the grant of the power of taxation. Metropolitan Utilities Dist. v. City of Omaha, 122 Neb. 93, 198 N.W. 858; Helena Consolidated Water Co. v. Steele, 20 Mont. 1, 49 P. 382, 37 L.R.A. 412. It was upon that theory that the court in People v. Hurlbut, 24 Mich. 44, held that the council of the City of Detroit was not compelled to issue any bonds upon demand of the parking board. Section 12 of the legislative act in question makes it mandatory to submit the question of the issuance of bonds. The issuance of bonds involves, of course, the levy of taxes to pay for them. It is true that the people can reject to issue them. Nevertheless, since the taxing power is vested only in the mayor and the city commission, the discretion to determine in the first instance whether the affairs of the city justify the issuance of bonds, and hence ultimate taxation, cannot, we think, be taken from them by vesting it in

some other board. It is a necessary step in ultimate taxation, and we find no justification in holding that though the whole of that power cannot be vested in the Board, some part of it may be. We think, accordingly, that the provisions here discussed are in violation of Section 37, Art. III of the Constitution, leaving in the city authorities, elected by the people, the power, of course, to commence condemnation proceedings and submit to the people the question of issuance of bonds, as they, in their discretion, may deem best.

C. *Control by City Authorities.* If it is correct that no body of men, except the elected municipal authorities can levy taxes, then, since the constitutional provision under consideration mentions municipal functions along with taxation, it would, at first blush, follow as a logical and necessary consequence that no body of men except the elected city officials can exercise any municipal functions. However, logic cannot be carried to that extreme in this case. There is a difference in the nature of powers to be exercised. It is a well settled rule, that administrative powers—and these only—may be delegated. McQuillin, supra, Sections 395, 399. But the delegation of such powers implies that the persons to whom such powers are delegated are subordinate to the officials which delegate the power—which in this case is done, indirectly at least, by the elected municipal officials. Thus it is held that acts may be performed by a public utilities commission, created in a city, if they are subject to the approval of the governing body of the city. Moore v. Logan (Tex. Civ. App.), 10 S.W. 2d 305. In other words, if the performance of municipal functions, is under the control of the elected municipal authorities, then the constitutional provision under consideration is not violated, otherwise it is. The authorities are in full accord, and it has, accordingly, been held in a

number of cases that under such constitutional provision no board or commission has the right to perform any municipal functions unless it is under the control of the regularly elected officials of the municipality. In Town of Holyoke v. Smith, 75 Colo. 286, 226 P. 158, it appears that the State Public Utilities Commission of Colorado claimed authority to regulate the rates for electricity in the Town of Holyoke, Colorado, when the plant was owned by the municipality. The court denied the right under the aforesaid constitutional provision, stating in part:

"This section in nowise deprives the Legislature of power to create special commissions for any purpose deemed necessary, and to delegate to them powers other than those mentioned in this section. The prohibition is not upon the creation of a special commission, private corporation, or association, but upon the delegation thereto of certain enumerated powers. * * * This court has, therefore, twice held that a body distinct from the city government, created for a different purpose, or one not connected with the general administration of municipal affairs, is a special commission. It cannot be denied that the Public Utilities Commission is a body separate and distinct from the 'city government,' and that it is created for an object 'not connected with the general administration of municipal affairs.' The framers of the Constitution had in mind the possibility that the Legislature might attempt to create some special body to interfere with the management of municipal affairs, and wisely made provision to prevent such action."

The court expressly disapproved of the case of Public Service Commission v. City of Helena, 52 Mont. 527, 159 P. 24. A similar case is the case of Logan City v. Public Utilities Commission, 72 Utah 536, 271 P. 961, decided under an identical constitutional provision. The court followed the decision of the Supreme Court of Colorado, expressly disapproving of the Montana case and held that the "Colorado case is sup-

ported by the better reason and is better founded on fundamental principles." In a concurring opinion, Justice Gideon stated:

"Section 29 of Article 6 of the Utah Constitution did not grant to municipalities the power to exercise the right of local self-government, or to own and control property, or to own and operate a public utility for the benefit of the inhabiatnts of such municipalities. These benefits the municipalities already enjoyed. On the contrary, the section is a limitation of the power of the Legislature to delegate to any body, save only the regularly elected officers of the municipalities, the right to supervise or interfere with the property of the municipalities, or to perform any municipal functions. The purpose of the constitutional provision quoted was to guarantee to the municipalities local self-government and to deny to the Legislature any power to delegate to any body other than the local government the right of supervision over or interference with the property of the various municipaltiies within the state."

In another concurring opinion, Justice Wooley stated:

"That the people of Utah, when they adopted section 29 of article 6 of the state Constitution, intended to limit the power of the legislative branch of government, so as to prevent the delegation of the power to perform municipal functions, or the power to supervise or interfere with municipal property, to any commission outside the municipal fold, and that they thereby manifest an intention, which must be respected by the courts, that municipal property shall remain under the supervision and control of, and municipal functions shall be performed by, municipal officials, who are amenable to the will of the inhabitants of the municipalities, so long as municipal corporations continue to exist and that section remains a part of the fundamental law, are propositions above the soundness of which I have no doubt."

We do not, in the case at bar, pass upon the power of the Public Utilities Commission in their State. We

have quoted from the foregoing cases mainly so that it may be noted that stress is laid upon the necessity of control by the regularly elected municipal officers in connection with the creation of boards. These cases are in accord with the statement of the Supreme Court of Pennsylvania in Stratton v. Allegheny County, 245 Pa. 519, 525, 91 Atl. 894, where the court, speaking of the constitutional provision here under considera-·tion, stated: "The purpose of the said action was to thereafter prohibit the legislature from naming a commission, composed of members who were in no way connected with the constituted authorities of municipalities, which was to perform some duty of a municipal character." And in Junge's Appeal, 89 Pa. Super. Ct. 548, 564, where the court sustained the creation by the city of a board of appeals in connection with zoning (approved in Ward's Appeal, 289 Pa. 458, 465, 137 Atl. 630), the court said:

"The purpose of the above mentioned provision in the Constitution was to prohibit the Legislature, either directly or indirectly, from taking away municipal powers from the municipal authorities and conferring them on outside bodies, as had been done by the General Assembly from time to time prior to the adoption of the Constitution of 1873, notably when the Legislature in 1870 created and appointed the Public Buildings Commission of Philadelphia."

In Perkins v. Philadelphia, 156 Pa. 554, 27 Atl. 356 (1893), the court held that an act transferring directly to the department of public works, as an independent body divorced from the administration of the city, certain powers relating to public buildings, was in violation of the section of the constitution under consideration. The case was distinguished in Poor District Case No. 2 (1938), 329 Pa. 410, 196 Atl. 837. It appears in that case that the legislature abolished the offices of poor director and poor auditor of the

various poor districts in the city. The purpose of the act was to unite all the poor districts into one, and to include them in a department of the city government, and have the district managed by that department. The case was distinguished from the Perkins case because the new district was to be managed as a department of the city government, pursuant to the express provision of the statute, and was, accordingly, under the control of the governing body of the city. Referring to the Perkins and other cases, it was stated in Philadelphia v. Spangler, 9 Dist. & County Rep. (Pa.) 577 (1927), in which a similar delegation of powers had been made as in the Perkins case that "All these cases, and others that might be cited, are clearly to the effect that, since the Constitution of 1874, the legislature cannot delegate new and additional powers of performing municipal functions to commissions not appointed by city authorities and not under their control." In Porter v. Shields, 200 Pa. 241, 49 Atl. 785, an act committing the construction and maintenance of sidepaths along the highways of a township to a board of "sidepath commissioners," was likewise held in violation of the constitution, the courts in Pennsylvania apparently including townships and counties within the term "municipality." So, too, the court in Com. ex rel. v. Smith, 9 Dist. & County Rep. (Pa.) 350, and in Keller v. Westgate, 10 Dist. & County Rep. (Pa.) 240, held that such sidepath commissioners were a special commission, performing municipal functions, and, therefore, illegal. In Lighton v. Abington Twp., 336 Pa. 345, 9 Atl. 2d 609, it appears that a township constructed a sewer system. In the bonds issued in payment was contained a provision that under certain circumstances a trustee should take control and management of the system. It was held that this provision was void under the constitutional provision above

mentioned; that a legislature could not delegate such power, and that a township, an agent of the State, was bound by the same limitation. On the same theory an ordinance was held to be void in Weatherly Borough v. Warner, 148 Pa. Super. Ct. 557, 25 Atl. 2d 831, which delegated to a street committee the power to determine what curbing should be constructed.

More specific even than these cases is the case of Moll v. Morrow, 253 Pa. 442, 98 Atl. 560. In that case it appears that the legislature permitted the city to create a Bureau of Public Morals in the Department of Public Safety. It provided for a board of seven directors appointed by the mayor and confirmed by the council, the directors being subject to removal at the pleasure of the mayor. The Board was to appoint their own superintendent. It gave power to the Board to investigate conditions growing out of sex relationship affecting public morals and to enforce laws and prosecute violations in matters of sex relationship, and for that purpose gave the Board police powers, the right to have detailed certain policemen and detectives to act for the Board, making them subject to the orders of the Board. The Board was also authorized to employ additional investigators and employ clerical help. The Supreme Court of the State approved the opinion of the lower court rendered by MacFarlane, J., in which it is stated in part as follows:

"This board of directors is not a bureau in the department of public safety, and calling it so does not help matters. The directors have full power to direct the work of the bureau and have dominion over all 'sex relationships affecting public morals.' The detail of policemen and detectives from the regular force is subject to the approval of the director of the department, but he must obey the requisition and his only discretion is in approving the choice of individuals. The men are subject to the board of directors only.

'The disguise is so thin that it can scarcely be called one'; Perkins, et al., v. Philadelphia, 156 Pa. 554. All other bureaus are subordinate to and under the control of the heads of departments of which they are a part. This only is equal in authority and power. There is no question that the legislature can establish almost any form of government it pleases and that it may subdivide municipal functions, create departments, bureaus and other agencies and change them. But the question is not determined by what might have been done. There has been created for cities of the second class a form of government. This bureau is alien from it in every characteristic."

The court then proceeds to show that all of the departments are under the control of the regular city officials, creating a system of supervision and control making it a responsible government, and the court proceeds then to say further:

"The act of 1913 does not create a new department. Without any amending or repealing clause it establishes a separate board of directors to administer a part of the police affairs of the city, expressing, but not carrying out the intention to create a bureau. It creates neither a bureau nor a department subordinate to the mayor, in whom is vested the executive power of the city. It is a special agency for the performance of a municipal function * * * The objection to the Penn Avenue commission, (Act of April 2, 1870, P. L. 796), was that the commissioners were independent of the proper municipalities and not agents of the city. They were not municipal officers. They were special for a special purpose. Judge White said, 'It is true that, before a set of commissioners can be elected for the improvement of any street, the councils must pass an ordinance directing the improvement and authorizing an election of commissioners. But that exhausts the powers of the councils in the premises, except to demand a bond, as above stated. The commissioners derive all their powers directly from the act of assembly. By the express terms of the act the powers are delegated to the commissioners and not to the city . . . I understand this Twentieth Section, of Article III, as

a positive prohibition against municipal functions being exercised by anybody, except the regular muncipal authorities." Referring to municipal agents or employees, he said: 'They cannot be an independent body, they cannot have the municipal power delegated to them, so as to be beyond removal, supervision or control from the regular municipal authorities'; Mellon v. Pittsburgh, et al., 21 P.L.J. 185, 186 (O.S.). * * * The public morals board of directors is not beyond removal, yet it is beyond control. It is created by the legislature not as a part of the established system. It is a special agency for a special and limited purpose. The act is clearly in conflict with the fundamental law. The great evils of special commissions led to the adoption of this section and it prohibits not only those of identical character but all others coming within its plain meaning."

The foregoing cases show conclusively, we think, that no board or commission can perform municipal functions unless it is under the control of the regularly elected municipal officers. In the case at bar the elected officials of Cheyenne have no control over the Board of Public Utilities, under the legislative act, which enables them to create the Board. The members are appointed by the city authorities and may be discharged for cause. But that is not sufficient, as shown by Moll v. Morrow, supra, in which it appears that the members of the board were subject to removal at the pleasure of the mayor, whereas, under our statute, they are subject to removal only for cause. In fact, the situation has been reversed by the legislature. Instead of the regularly elected officials of the city having control of the Board of Public Utilities, the latter has control of the regular city authorities, so far as the water works are concerned, for it has the power under the statute to compel the former to pass any ordinances which it may desire; compel them to commence condemnation proceedings, and compel them to submit to the people the question of issuing bonds. It is too

plain for argument that under the statute, as it stands, the Board of Public Utilities is an independent, special commission to perform municipal functions. It could not be made much more independent. Such a reversal of control cannot be sustained under our constitution unless we go contrary to all the authorities on the subject and contrary to the principle, which seems sound, therein announced. We have already referred to some provisions of Section 4 and Section 12 of the Act, indirectly relating to the subject of taxation. Objectionable, too, is the provision in Section 4 of the statute, which makes it mandatory upon the governing board of the city to enact such ordinance as may be deemed necessary by the Board for the protection of the water plant. We have already stated that a mandatory provision such as contained in the statute is the equivalent of a direct grant of the power of legislation. Such provision cannot stand even under the general principle that legislative power cannot be delegated. It is said by McQuillin, supra, Section 395, that "under state constitutions power conferred upon the legislatures to make laws may not be delegated to the people of the state or any portion of them. The only apparent exception in this respect is the power of legislation granted by the state legislature or constitutional authorization to the municipal corporation," or to the people by initiative and referendum. See also 1 Cooley, Const. Limitation (8th Ed.) p. 231 et seq. Objectionable, too, at least without other sufficient provisions of control, is the last sentence of Section 1 of the statute in question, which provides that when the Board of Public Utilities has been established it shall not be abolished, except at a regular city election by a majority vote of the qualified electors. Until such election there is no control of the Board whatever. That provision, if permitted to stand, would make the whole statute unconstitutional and, therefore, is itself

unconstitutional, though we do not say that it would be so if sufficient control over the Board were provided otherwise. See Commonwealth v. Krebs, 43 Pa. County Court Rep. 425.

It does not, of course, follow that merely because some of the provisions of the statute are unconstitutional, that the whole statute is invalid. Section 14 of the statute provides that, "If any provision in this Act shall for any reason be invalid, it shall not affect the remainder of this act and this act shall remain in force and effect the same as if such part held invalid had not been included herein." We must give effect to this provision, 59 C.J. 647-648. We think it is clear that all of the objectionable provisions of the statute heretofore discussed are separable and distinct, and it has been held that, "If, when the invalid part is stricken out, that which remains is complete in itself and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must be sustained to that extent." 59 C.J. 642.

The cases have not defined the exact measure of control above mentioned. If the last sentence of Section 1 is stricken, it would leave the mayor and city commission free to repeal the ordinance by which the Board of Public Utilities was created. 43 C.J. 562-563. If all the objectionable parts of the statute heretofore discussed are stricken, as they must be, leaving the mayor and the city commissioners the power to abolish the Board of Utilities at any time, and leaving the Board an administrative board, then, it would seem,— at least in so far as the case has been argued—it could hardly be said that the Board is an independent, special commission, beyond the control of the regularly elected municipal officials, and with such provisions stricken the statute would seem to reasonably con-

form to the principle announced in the decisions of the courts heretofore cited.

We, accordingly, answer the queries propounded to us, by holding that the statute in question, and its various provisions, and the ordinance passed in pursuance thereof, are not in contravention of the constitutional provisions mentioned to us in the certificate of the trial court, when all of the objectionable provisions above discussed are stricken, as they must be. It would seem that a more categorical answer is not required.

The parties will pay their own costs, and no costs will be taxed for the briefs.

KIMBALL, C. J. and RINER, J., concur.